James L. Buchal, OSB No. 921618
MURPHY & BUCHAL LLP
3425 SE Yamhill Street, Suite 100
Portland, OR 97214
Tel: 503-227-1011
E-mail: jbuchal@mbllp.com
*Attorneys for Joseph Gibson and Russell Schultz*

D. Angus Lee, WSB No. 36473 (*Pending Admission Pro Hac Vice*)
Angus Lee Law Firm, PLLC
9105A NE HWY 99 Suite 200
Vancouver, WA 98665
Tel: 360.635.6464
E-mail: Angus@AngusLeeLaw.com
*Attorney for Joseph Gibson and Russell Schultz*

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| JOSEPH GIBSON and RUSSELL SCHULTZ,<br><br>Plaintiffs,<br><br>v.<br><br>MIKE SCHMIDT, in his official capacity as District Attorney of Multnomah County, Oregon, MULTNOMAH COUNTY DISTRICT ATTORNEY'S OFFICE, and BRAD KALBAUGH, in his official capacity as a Multnomah County Deputy District Attorney,<br><br>Defendants. | No.<br><br>**PLAINTIFFS' COMPLAINT** |

For their complaint, plaintiffs allege as follows:

## NATURE OF ACTION

1.     This action seeks a temporary restraining order, preliminary injunction, and permanent injunctive relief against Defendants pursuant to Fed. R. Civ. P. 65 for the narrow purpose of preventing the Defendants, from continued prosecution of Plaintiffs in *State v. Gibson* (19CR53042) and *State v. Schultz* (19CR53035).

2.     Defendants are engaged in a bad faith, selective, and retaliatory prosecuting of Plaintiffs because Plaintiffs have publicly expressed opinions with which Defendants disagree.  Specifically, Plaintiffs protested against Antifa and the local government's failure to hold Antifa accountable for criminal conduct.  As a result of Plaintiffs protest activity, they are currently being prosecuted for Riot by Defendants.

3.     While Defendants willingly allow a group known as Antifa to engage in mass criminal conduct to the detriment of the City of Portland, and intimidate the public and public officials, Defendants continue to prosecute Plaintiffs for violation of the riot statute, ORS 166.015, when (1) there is no evidence of any violation of the statute by Plaintiffs, (2) Defendants have admitted before the Multnomah County Circuit Court that Mr. Gibson did not engage in any conduct even amount to assault, (3) Defendants have enacted a formal policy of presumptive dismissal of riot charges arising out of protest activity but have selectively refused to apply that formal written policy to Plaintiff's criminal charges, and (4) Defendants have provided no constitutionally permissible basis for the selective prosecution of Plaintiffs in violation of Defendants' own written policy.

4.     The continued bad faith prosecution of Plaintiffs would cause real, lasting and irreparable harm to Mr. Gibson and Mr. Schultz.  Accordingly, Plaintiffs entitled to

an injunction under Fed. R. Civ. P. 65 prohibiting Defendants from continued prosecution of Plaintiffs in State v. Gibson (19CR53042) and State v. Schultz (19CR53035).

5.    Defendants, acting under color of law, are attempting to conspire to deprive Plaintiffs of rights secured under the Constitution and laws of the United States for the purpose of denying Plaintiffs equal protection of laws, and thereby have deprived Plaintiffs of rights, privileges and immunities as guaranteed by the First, Fifth, and Fourteenth Amendments to the Constitution of the United States, 42 U.S.C. and §§ 1983, 1985, and 1988.

## JURISDICTION, VENUE, AND STANDING

6.    The District of Oregon at Portland has subject matter jurisdiction under Fed. R. Civ. P. 65, 42 U.S.C. §§ 1983, 1985, and 28 U.S.C. §§ 1331, 1332, and 1343.

7.    The District of Oregon at Portland has personal jurisdiction over Multnomah County District Attorney's Office (MCDA), and all co-defendants, as MCDA is located in the jurisdiction of District of Oregon at Portland.  Additionally, the acts and omissions complained of here took place in the jurisdiction of the District of Oregon at Portland.

8.    Venue is proper in District of Oregon at Portland pursuant to 28 U.S.C. § 1391 as a substantial part of the events and omissions giving rise to the claims asserted herein occurred in Portland, Oregon.

9.    All defendants are doing business in Portland, Oregon and are citizens of the United States of America.

## PARTIES

10.    Plaintiff Joseph Gibson is a private individual residing in Clark County, Washington State.  Joseph Gibson was at all times relevant a citizen of the United States residing in Clark County, Washington.

11.    Plaintiff Russell Schultz is a private individual residing in Clark County, Washington State.  Russell Schultz was at all times relevant a citizen of the United States residing in Clark County, Washington.

12.    Defendant Multnomah County District Attorney's Office is a department of Multnomah County, political subdivision of the State of Oregon, located in Multnomah County, Oregon.

13.    Defendant Mike Schmidt is a resident of Multnomah County, Oregon, and the duly elected and appointed District Attorney of the Multnomah County, Oregon, acting at all relevant times in his official capacity as District Attorney for the Multnomah County District Attorney's Office.  As such Mike Schmidt is the supervisor and employer of defendant Brad Kalbaugh, and is responsible for his training, supervision, and conduct. Mike Schmidt is also responsible by law for creating policy for the MCDA, and for ensuring that MCDA personnel follow policy and obey the laws of the State of Oregon and of the United States.  Mike Schmidt is being sued both in his official capacity as District Attorney.

14.    Defendant Brad Kalbaugh, is a resident of a resident of Multnomah County, Oregon, and employee of the MCDA, acting as a lawfully appointed Deputy District Attorney. Brad Kalbaugh is being sued in his official capacity as Deputy District Attorney.

## STATEMENT OF FACTS

### Political Activity by Plaintiffs

15.     Mr. Gibson utilizes social media to organize public events promoting patriotism, prayer, and living a God-fearing lifestyle utilizing the name "Patriot Prayer".

16.     Mr. Gibson is an advocate for freedom and believes it is imperative for followers of Christ to take the church into the streets.

17.     He believes Jesus Christ is the Son of God and all should repent and seek forgiveness.

18.     Mr. Gibson is openly pro-life.

19.     Mr. Gibson has a long history of conducting public demonstrations under the name "Patriot Prayer" to promote free speech, patriotism, and conservative Christian values.

20.     He has publicly condemned Portland area political leaders for their tolerance of Antifa.

21.     Antifa has regularly attended events organized by plaintiff Gibson as counter-protestors.

22.     Mr. Gibson views Antifa as an anti-American terror group.

23.     Thus, in addition to his promotion of free speech, patriotism, and Christian values, Mr. Gibson has often protested against the local government's indulgence and support of Antifa.

24.     Mr. Schultz often attends rallies with, and supports Mr. Gibson.

**The General Hateful Climate Against Conservatives in Portland.**

25.    Long before the events of giving rise to the criminal prosecutions at issue here, the political leadership of Portland, joined by local media had begun a continuous attack upon Mr. Gibson for his political views, and had begun to display an extraordinary failure to provide equal protection of the laws where Antifa members were involved.

26.    In late 2016 political leadership in Portland took little action to control repeated rioting in the wake of President Trump's election.

27.    The degree of hostility toward conservative positions and the President are sufficiently extreme within Multnomah County that three days of widespread demonstrations, in which Mr. Gibson had no involvement whatsoever, arose after the election of President Trump, with crowds rampaging through the streets and damaging property to the extent that the police declared a riot.

28.    Over time, as Mr. Gibson began to hold occasional events in Portland, a campaign of continuous and hostile media coverage from leading papers was waged against him.

29.    Nearly every article falsely labeled Mr. Gibson with such terms as "white supremacist," "violent, far-right extremist," "far-right organizer," or even one of the "fascist agitators bring[ing] choreographed terror into our community".

30.    By May 2017, Mayor Wheeler also stated that the City "has NOT and will not issue any permits" for any "alt right events".

31.    In June 2017, Mr. Gibson obtained a permit from federal authorities for a Trump Free Speech Rally in Portland, which prompted Mayor Wheeler to state publicly

that he asked the federal government to revoke the permit Mr. Gibson had obtained,

stating that there was no "place for bigotry or hatred in our community . . .".

32.    In a July 2018, the Mayor said the following to Oregonian reporter

Gordon Friedman:

> "It's no secret that I'm no fan of the people from Vancouver who come
> down here and spout their venom.  Their intentions have been – Joey
> Gibson made it very clear that his objective was to get the cops and Antifa
> into it with each other.  The Police Bureau, having gone through this
> exercise a number of times, is smarter than that.  They understand people
> are going to try to drag them in.  Their objective is to focus relentlessly on
> giving people space to exercise their rights and protect the public."

33.    In September of 2017, a "Patriot Prayer Free Speech Rally" was held at

the Portland Waterfront.

34.    In preparation, the Portland Police Bureau compiled an Incident Action

Plan which included a cover page with a photo of Mr. Gibson, center frame, indicating

his status as the lead organizer of the protest.

35.    Although four other organizations were referenced in the PPB's Incident

Action Plan and had had some communication with PPB, only Mr. Gibson is mentioned

by name.

36.    Hostility to the political messaging of Mr. Gibson is so powerful in

Portland that it can ruin the careers of any who dare defend him.

37.    When he held a rally at Washington State University in Vancouver, and an

Oregonian columnist Elizabeth Hovde, who is an adjunct professor at the University,

accurately reported on October 28, 2018 as follows:

> For two hours, I watched challenging, inquisitive, respectful conversations
> happening on the campus plaza between people of different political
> persuasions. Instead of the violence predicted, Gibson brought something
> we need more of: talk that leads to increased understanding about

opposing thoughts and the people behind them. It was the kind of conversation that helps people find common ground.

38.    Following her reporting, a petition was posted on change.org called "Demand The Oregonian Stop Platforming Violent Racism," which gathered thousands of signatures, calling for a boycott of Oregonian advertisers and the firing of Ms. Hovde.

39.    Several local groups demanded that she be fired, and The Oregonian "issue a front page apology to our community for their callousness and carelessness in publishing."

40.    Mayor Wheeler attacked Mr. Gibson by accusing Ms. Hovde of finding "common ground" with "hate extremism and violence.

41.    Multnomah County Chair Deborah Kafoury took the opportunity to attack Mr. Gibson by accusing Ms. Hovde of "[g]iving a voice to people who live only to stoke violence and hate."

42.    Numerous political leaders joined the attack, and the Editorial Board of The Oregonian repudiated Ms. Hovde's piece.

43.    When Mr. Gibson was contacted by a representative of the Portland Police named Jeffrey Niiya, who sought information about Mr. Gibson's planned activities within Portland, Mr. Gibson exchanged hundreds of text messages with him, because providing information about his plans would help the Portland Police Bureau avoid violence and conflict by providing information for planning to maintain order.

44.    When this fact was publicly reported Portland Commissioner Jo Ann Hardesty issued a statement, "I am not shocked, and I am not surprised at today's reporting of Lt. Jeff Niiya's collaboration with Patriot Prayer leader Joey Gibson over text to provide aid and support for their hate marches".

45.     Commissioner Chloe Eudaly issued her own statement accusing Portland Police of "collaboration" with "white supremacist and right-wing extremist groups and individuals"—referring to Mr. Gibson, and publicly asked Portland Police to "explicitly and unequivocally state that Patriot Prayer … [is] a significant threat to our public safety."

46.     Lt. Niiya was then removed from the Rapid Response Team that responds to Portland demonstrations.

47.     By March 2019, it was publicly reported that Mayor Wheeler was bringing pressure on the Multnomah County District Attorney's office to arrest right wing protestors.

48.     By the time the events giving rise to the criminal charges that form the subject of this suit occurred, all elected leaders within the City of Portland who had spoken on the question, and all of the media coverage, was uniformly and falsely painting plaintiff Gibson as a monster.

**Plaintiffs' Protest Against Antifa.**

49.     Then, on May 1, 2019, plaintiffs determined to attend a demonstration outside a Portland cider bar, "Cider Riot," a demonstration intended to call attention to its status as a well-known hangout for Antifa members in Portland.

50.     Mr. Gibson and Mr. Schultz damaged no property, threw nothing, and committed no assaults.

51.     The protest was during daylight hours and lasted about 25 minutes from start to finish.

52.     When the protest was over Mr. Gibson, Mr. Schultz, and others, left the area of their own accord.

53.     Police did not involve themselves with the protest whatsoever, nor did they declare a "riot" at any point.

54.     The videos show that upon Mr. Gibson's arrival outside the premises of Cider Riot, a bar patron immediately assaults him.

55.     Mr. Gibson's response:  "De-escalate.  This is a public sidewalk."

56.     Mr. Gibson begins narrating to his livestream, "hey, this is an Antifa bar right here, check it out".

57.     Another Antifa member begins attempting to start a fight, saying "de-mask us" and "de-mask us, you little f*****g fascist".

58.     Mr. Gibson stands on the street corner or moves to the north along the west sidewalk, narrating his own livestream video, saying things like "Here we go.  Look at all the masks.  Look at Antifa communist bar.  Cider Riot.  Downtown Portland.  Look it up."

59.     They spit on him, permitting him to display the spit on the livestream.

60.     A virulent woman who attacked Mr. Gibson as he arrived comes up and bumps against him.

61.     One can see on Mr. Gibson's live feed that he responds "don't touch me," and keeps nonviolently her away at arms-length as she kicks at him.

62.     Despite the spitting, striking his phone, and kicking, Mr. Gibson makes no attempt to retaliate or escalate against the woman, remaining calm.

63.    The next event of significance is that another Antifa woman throws her glass of beer or cider at a demonstrator, hitting him full in the face and splashing many.

64.    A large quantity of mutual pepper spraying then ensued, But Mr. Gibson does not spray anyone or throw anything, but rather simply continued filming the events, continued his reporting, and stating:  "Call the police!"

65.    Mr. Gibson is clear that he does not want the demonstrators to behave violently, saying: "Don't throw anything!  Let them be violent.  Let them be violent. This is Cider Riot.  They are violent.  They are hateful."

66.    Mr. Gibson continues his narration:  "This is Cider Riot.  And they are pepper-spraying us, they are assaulting us.  This is an establishment with alcohol."

67.    He is then targeted with pepper spray by an Antifa member who emerges from the patio area, charges and sprays him and then retreats.

68.    Mr. Gibson merely responds: "This is how they are acting."

69.    He continues his broadcast, stating:

"This is Cider Riot.  This is Cider Riot.  Everybody, downtown Portland. Look it up.  Look it up.  This [is] Antifa Central.  Antifa Central.  Yep, communists.  Antifa Central, right here.  You want to know where they hang out?  It's right here.  Find out the landlord.  Find out the owner. Look it up.  You want to know the truth.  Look it up."

70.    Members of Antifa shout at Mr. Gibson, attempting to encourage him to fight and even threatening him with death, saying  "I'll f*****g kill you," but Mr. Gibson never responds in kind.

71.    Instead, he speaks to the broadcast audience:  "Do something about it.  Do you guys care?  Do you care about Portland?  Do something.  Take care of this establishment."

72.     Soon after, a masked Antifa attacker rushes out, attacks Andy Ngo, a journalist with a reputation for documenting Antifa misconduct, and runs off.

73.     Mr. Gibson then has a dialogue with Heather Clark which is interrupted by an Antifa attacker who runs up and sprays Gibson directly with pepper spray.

74.     Mr. Gibson to again attempt to avoid violence, shouts: "Hey!  Hey!  Easy!  Easy!  Calm down!  Calm down!"

75.     Not long after this, Mr. Gibson turns with his camera and catches the beginning of fist fight between Cider Riot's bouncer, Joseph LeVasseur, and another individual.

76.     As others present make appeared ready to join in the fist fight (which would create a brawl) Mr. Gibson yelled "Stay back!" and "No one jump in!  No one jump in!"

77.     When the fist fight was over, LeVasseur approached Gibson and shook hands with Gibson.

78.     Later, another physical altercation occurred between Ms. Clark and others.

79.     The video evidence confirms that there were individuals in both the Antifa group and the protest group who engaged in violent and tumultuous conduct, but they are devoid of any evidence that plaintiffs engaged in such conduct.

80.     No participant on the Antifa side of the confrontation, including the door man who engaged in a fist fight, has been arrested or charged in connection with the activities, although some were obviously known to the police.

## The Continuing Negative Media.

81.    Within a couple of days after May 1st, Oregon Public Broadcasting

chimed in with headlines comparing a civil suit filed by Cider Riot to efforts to fight the

Ku Klux Klan and one-sided reporting labeling Mr. Gibson as a "fascist bully".

82.    Mayor Wheeler attacked Mr. Gibson and his lawyer directly in a July

2019 press conference:

> "… I think it showed some odd judgement on the part of Mr. Buchal to step forward and support somebody who comes to our community from Washington state. He's publicly stated in the past that he comes here with others who are often committed publicly to committing acts of violence. My understanding is that, at one point, Mr. Gibson, said that he came to Portland because he believed he could get people on the Left to agitate against our local police officers. And he also did it in the context of a political campaign, a failed political campaign for the United States Senate. And I have to ask myself, what kind of person does that? The men and women that I know in the Portland Police Bureau, they give their all for this community and to think there's somebody who comes from a different state to our community to put the men and women of our police bureau in potential harm's way for his own political gain and publicity? That's beyond cynical. And so why Mr. Buchal could think that's worthy of protection and why he would put the GOP seal on it is frankly beyond me."

83.    Mayor Wheeler also accused Mr. Gibson, in substance, of "co-opting" the

right of free speech, and "hiding behind" the First Amendment."

84.    The extraordinary attempts by Mayor Wheeler to support Antifa and

condemn plaintiff Gibson is best captured in a back and forth with an Oregonian

Reporter:

> FRIEDMAN: I think when people hear you talk about the folks who come from out of town and cause problems here, they feel that it disregards Portland's homegrown antifa movement.

> WHEELER: That has been one narrative. In fact, that is an unsubstantiated narrative that's been carried in the last several weeks but some in what I would call extreme media sources.

85.     Given the recent hundred days of rioting in Portland, it should be now obvious that the claim that it is "unsubstantiated" that "Portland's homegrown antifa movement" causes any problems in Portland is pure partisan politics.

86.     On August 14, 2019, Mayor Ted Wheeler held a widely-publicized rally at which he further continued ongoing efforts to isolate and demonize right-wing protestors, declaring "So hear me loud and clear.  To those of you who plan on using Portland on August 17th as a platform to spread your hate, you are not welcome here."

87.     The Mayor's rally then brought forward speaker Debra Kolodny, who declared:

> Pandering to a national climate that accuses Portland of being soft on Antifa is unacceptable.  There is no equivalence between racist, anti-Semitic, Islamophobic, homophobic violence and those who say no to it. Antifa must not be scapegoated.  We are in truth a City that is anti-fascist.

**The One-Sided Grand Jury Presentation.**

88.     The Deputy District Attorneys primarily responsible for handling the prosecution of Mr. Gibson is Brad Kalbaugh.

89.     When Mr. Gibson's legal counsel in a civil suit with the bar Cider Riot learned the Defendants had convened a Grand Jury he sent a lengthy declaration by Mr. Gibson regarding the incident to defendant Kalbaugh and asked that Mr. Gibson's declaration be provided to the Grand Jury for consideration.

90.     Mr. Kalbaugh refused to provide the declaration to the Grand Jury.

91.     Nor were Mr. Gibson or Mr. Schultz permitted to testify to the grand jury themselves, nor advised by the prosecution of their right to do so under ORS 135.095 and ORS 135.100.

### The Arrest - Months After the Protest.

92.     Mr. Gibson is currently being prosecuted in State v. Gibson (19CR53042).

93.     Mr. Gibson is charged with a single count of riot and is being prosecuted by Defendants.

94.     In State v. Russell Schultz (19CR53035), Mr. Schultz is also charged with a single count of riot and being prosecuted by Defendants.

95.     Approximately two months after the protest, Mr. Gibson was charged by MCDA with a single count of riot, booked into custody, and later released after posting bail.

96.     Following that, Mr. Schultz was charged with a single count of riot by MCDA and arrested by United States Marshals while he was at home in Washington State.

97.     During his arrest, a law enforcement officer told Mr. Schultz that Mayor Ted Wheeler had "pressured" the District Attorney to charge Mr. Schultz and Mr. Gibson for the incident outside of Cider Riot.

98.     Mr. Schultz was booked into the local jail where the extradition process started.

99.     Mr. Schultz spent five nights in jail and has been required to check in weekly with pretrial probation services.

100.     Both have greatly reduced their political activity in the Portland area out of fear that additional baseless charges will be filed.

101.     Mr. Schultz has suffered at least one lost employment opportunity as a result of the riot charge against him.

**Discovery in the Criminal Case.**

102.    When Mr. Gibson's legal counsel obtained defendant Kalbaugh's affidavit in support of an arrest warrant for the arrest of Mr. Gibson, it became apparent that it contained statements dramatically contradicted by the mass of video evidence available concerning the events in question.

103.    Most egregiously, Mr. Kalbaugh declared that Mr. Gibson was "physically pushing Heather Clark, the woman who was eventually knocked unconscious [by another defendant]".

104.    The above allegation by Mr. Kalbaugh is entirely false.

105.    The video evidence cited above makes it clear that Mr. Gibson was moving backwards and away from Ms. Clark with his hand up and arm outstretched while she aggressively and angrily charged at him, throwing punches in Mr. Gibson's direction.

106.    Not one police report or witness statement provided in discovery asserted that Mr. Gibson pushed Ms. Clark.

107.    Mr. Kalbaugh, or his source, appears to have made the incident up out of the whole cloth.

108.    The Oregon Liquor Control Commission (OLCC) investigated the incident and issued a report in which it captioned a picture of the incident as "picture of victim Heather Clark attacking Joey Gibson."

109.    It appears that even the lead detective on the case does not join defendant Kalbaugh in his claim, writing in his report:

110.    Ms. Clark was seen to clearly take exception to Coopers actions and moved forward towards Cooper.  A crowd followed her but their actions appeared motivated by an effort to restrain Ms. Clark. Joey Gibson and Chris Ponte [are] also seen to re[s]train Ms. Clark whose anger was clearly aimed at Demi Cooper.

111.    Further, during a recorded witness interview of Robert West, provided in discovery, the lead detective stated to West "I think it's fair to say that Gibson was trying to hold her back."

### The Political Prosecution of Plaintiffs

112.    Mr. Gibson has been represented in the criminal case by legal counsel with experience in criminal prosecution and criminal defense.

113.    After Mr. Gibson's counsel in the criminal case reviewed all discovery made available by the Multnomah County District Attorney's Office, he did not see evidence of any act that could reasonably be interpreted as tumultuous and violent by Mr. Gibson or Mr. Schultz.

114.    Rather, the discovery showed that Mr. Gibson and Mr. Schultz were in a public location, engaged in speech critical of Antifa, and were assaulted by patrons of a nearby Portland Bar, Cider Riot.

115.    They went to that location and protested Antifa at Cider Riot.

116.    There was a crowd of mostly masked individuals on the patio of Cider Riot when they arrived and began to protest while live streaming on the internet.

117.    When they began the protest against the Antifa group, Mr. Gibson was spat upon and pepper sprayed repeatedly by the Antifa group he was protesting.

118.    Video of the protest shows the involvement of Mr. Schultz and Mr. Gibson during the protest.

119.    The video is devoid of any act of "violence" of "tumultuous conduct" committed personally by Mr. Gibson or Mr. Schultz.

120.    The discovery also shows that local police were aware of the protest and observed the protest while it was occurring, but did not take any enforcement action nor declare a riot

121.    Mr. Gibson and Mr. Schultz were not charged with any assault.

122.    None of the persons affiliated with the alleged Antifa group were ever charged with any crime.

123.    Counsel for Mr. Gibson sent a letter to the lead detective and Deputy District Attorney Kalbaugh, formally requesting charges on one identified member of the Antifa group that had assaulted Mr. Gibson.

124.    No charges were ever filed on the identified member of the Antifa group that had assaulted Mr. Gibson.

125.    Seeing no evidence that established that Plaintiffs engaged in riot, defense counsel for Mr. Gibson filed a motion for a bill of particulars.

126.    In the motion, defense counsel requested the Court "to order the State to either provide a bill of particulars or elect the specific act or acts it claims establish "tumultuous and violent conduct" (as opposed to speech) on the part of both Mr. Joey Gibson and Mr. Russell Schultz."

127.    Defense counsel argued that there is no evidence in the record establishing riot by Plaintiffs, writing:

Pleadings filed from the State in this matter have repeatedly alleged Mr. Gibson and Mr. Schultz engaged in "taunting" Antifa (a subject of the protest). This only muddies the waters as Mr. Gibson and Mr. Russell, were engaged in a protest at the time of the taunts in question. A bill of particulars, or election by the State, will serve to provide sufficient notice of what is actually alleged so that Mr. Gibson can prepare a defense, and also serves to ensure that Mr. Gibson is only be[ing] prosecuted for conduct, and not protected speech.

…

And what on earth is Mr. Schultz alleged to have done? He is hardly mentioned in the police reports and the video shows zero physical interaction between him and any other individual. If the State is prosecuting Mr. Schultz for "taunting" Antifa it should make this clear. Nothing in discovery or pleadings (aside from a baldly asserted legal conclusion) provides any evidence or indication of any conduct that could be described as violent or tumultuous by Mr. Schultz.

**MCDA Refused to Provide Exhibit List or Real Bill of Particulars Per Court Order.**

128.    The Multnomah County Circuit Court heard argument on the motion and ordered the MCDA to provide a bill of particulars to the defense.

129.    The State was also to "prepare an exhibit list in which it would identify the specific video clips it intends to introduce into evidence thereby making it possible to identify specific co-defendant statements at issue well in advance of trial."

130.    But as of September 10, 2020, no exhibit list had been provided, and the "bill of particulars" provided by the State is superficial and meaningless.

The bill, which is not in compliance with the Court's order, reads as follows:

The State of Oregon's theory of guilt is that the actions committed by each of the above referenced defendants as documented in Portland Police Bureau report numbers 19-141483, 19-143459, 19-141889, and 19-680568, and as recorded on video by one or more sources as documented in discovery that the State of Oregon provided to each of the defendants in accordance with ORS 135.815 and the Oregon and United States Constitutions, began no earlier and ceased no later than the times referenced in the video recordings and police reports on or about May 1, 2019.

Page 19:    PLAINTIFFS' COMPLAINT

**MCDA Announces Non-prosecution Policy for Cases Where "Riot" Is Only Charge.**

132.    The District Attorney for Multnomah is Mike Schmidt.

133.    On August 11, 2020, the Multnomah County District Attorney announced a new policy regarding protest related criminal cases.

134.    The policy states clearly that charges will presumptively be dismissed if the case consists of only a single charge of riot arising out of a protest.

135.    The policy itself includes a section that explains the rationale behind the policy:

> [T]he prosecution of cases relating solely to protest activities, most of which have a weak nexus to further criminality, and which are unlikely to be deterred by prosecution, draws away from crucially needed resources. As stewards of public resources, we must devote our efforts to prosecuting crimes that allow us to protect our most vulnerable victims to have the greatest impact on promoting a safer community for everyone in Multnomah County.

136.    Section one of the policy, titled "Presumption of dismissal/declination" then goes on to make very clear that in cases where only riot has been charged the case should be dismissed.

137.    Along with the announcement, the MCDA issued a press release which reads, in part:

> Today, District Attorney Mike Schmidt announced a policy that will promote a safer community and that reduces the negative and lasting impacts a person can experience once involved in the criminal justice system following an arrest resulting from a peaceful protest or mass demonstration.
>
> "In order to advance public safety, we must not only prevent crime, but we must also promote economic and housing stability, educational opportunities, strong family and community relationships, and the mental and physical health of all those in our community. If we leverage the full force of the criminal justice system on individuals who are peacefully

protesting and demanding to be heard, we will cause irreparable harm to them individually and to our society. The prosecution of people exercising their rights to free speech and assembly in a non-violent manner takes away from the limited resources that we have to prosecute serious crimes and to assist crime victims," said District Attorney Mike Schmidt.

Since late May, we have seen nightly demonstrations where people take to the streets to express their collective grief, anger and frustration over the senseless murder of George Floyd, and the countless other abuses People of Color have endured throughout history.

"As prosecutors, we acknowledge the depth of emotion that motivates these demonstrations and support those who are civically engaged through peaceful protesting. We will undermine public safety, not promote it, if we do not take action to bring about immediate change," DA Schmidt said.

138.    In application, the new Non-prosecution policy was also tied to promoting specific political activity.

139.    On August 23, 2020, The New York Times reported that the MCDA had refused to prosecute hundreds of offenses tied to Portland demonstrations against systemic racism and police brutality.

140.    "Ten days after taking office, Mr. Schmidt effectively dismissed charges against more than half of about 600 people arrested since the protests began at the end of May."

141.    The Times reported that the purpose, Mr. Schmidt said, is to balance "people's righteous anger and grief and fury over a system that has not really been responsive enough for decades and centuries" with the need to prevent property damage and violence.

142.    "At a time when legitimacy in our criminal justice system is probably at an all-time low, we can't be seen to be using that very system to silence the speech that is being critical of it," he said.

143.    Yet despite all the dismissals, The Times reported "Mr. Schmidt said that he believed the Gibson case merits prosecution."

144.    As of September 10, 2020, trial in Mr. Gibson's and Mr. Schultz's cases is set to begin in Portland on October 26, 2020.

**MCDA Refuses to Apply Non-prosecution Policy to Mr. Gibson.**

145.    Counsel for Mr. Gibson sent a letter to Deputy District Attorney Brad Kalbaugh asking that charges against Mr. Gibson be dismissed per the policy, since Mr. Gibson's case fits squarely within the parameters of cases to be presumptively dismissed.

146.    The letter in part reads as follows:

Dear Mr. Kalbaugh,

Upon review of the newly announced Multnomah County District Attorney's Office (MCDA) policy to dismiss protest related cases where the most serious charge is riot, we respectfully request that the case against Mr. Gibson be dismissed, since during his protest activities, he did not engage in any conduct amounting to assault or damage any property, and the most serious offense with which he is charged is riot.

According to the MCDA policy, there is a "Presumption of dismissal" in cases "where the most serious offenses are city ordinance violations and crimes that do not involve deliberate property damage, theft, or the use or threat of force against another person." The policy on presumptive dismissal specifically includes cases where the most serious charge is riot, which is Mr. Gibson's only charge.

In March, you correctly stated on the record at the motion hearing, that Mr. Gibson had not personally engaged in conduct that would even amount to an assault during the protest from which his riot charge arose. Accordingly, the presumption of dismissal applies.

147.    Deputy District Attorney Kalbaugh responded by email, writing "I am meeting with Mr. Schmidt tomorrow. I expect to have an answer for you (and everyone else) after that meeting."

148.    Despite the written policy, after Deputy District Attorney Kalbaugh had his meeting with District Attorney Schmidt, he emailed all defense counsel that the MCDA would not dismiss the riot charge currently pending against Mr. Gibson and Mr. Schultz.

**Kalbaugh Admits Non-prosecution Policy Is Being Applied Retroactively for Others.**

149.    After receiving notice that D.A. Schmidt had decided to exclude Mr. Gibson and Mr. Schultz from the policy, Counsel for Mr. Gibson emailed Mr. Kalbaugh and asked if the dismissal policy would be applied to other cases that had been charged in the months prior to the enactment of the formal policy.

150.    When asked, Mr. Kalbaugh confirmed by email that, in fact, the policy was being applied retroactively to cases charged prior to the enactment of the formal policy, and cases initially charged during the prior MCDA administration, responding: "That's my understanding."

151.    Counsel for Mr. Gibson then inquired of Mr. Kalbaugh as to what justification there was for selection of Mr. Gibson for further prosecution, writing:

> Are at liberty to disclose to me the rationale for why this policy would apply to those involved in the current protests and not those involved in other protests? One would think that the policy would apply to any case arising out of political activity, and not just political activity involving the elected DA's favored political viewpoint, since it is being applied to cases that arouse prior to him taking office.

152.    Mr. Kalbaugh refused to respond to the question in the final email.

153.    In an article published later that day in the Oregonian, it was reported that District Attorney Schmidt had announced that the MCDA "won't prosecute people on a riot accusation alone. Prosecutors will proceed with a riot case only if it includes an accompanying allegation of specific property damage or use of force, he said."

**MCDA Schmidt's Antifa Connection and Predisposition Against Plaintiffs.**

154.    The Post Millennial reported on August 15, 2020 that District Attorney Schmidt "who refuses to prosecute Portland rioters, admits he is "old buddies" with an Antifa militant [who is] campaigning to defund the police, abolish prisons, and demand reparations."

155.    The Post Millennial reported that District Attorney Schmidt had also claimed that the criminal justice system was built on "white supremacist culture."

156.    The above referenced reporting was accurate.

**The Public and Political Murder of Aaron "Jay" Danielson.**

157.    On August 29, 2020, Aaron Danielson was walking down the street in Portland, wearing a "Patriot Prayer" hat, when he was gunned down on video.

158.    Danielson's murder by a self-proclaimed supporter of Antifa, was nothing to be sorry about for local activists in Portland.

159.    In fact, a group of Portlanders gathered in the street and actually cheered news of the murder.

160.    Despite clear video of the unprovoked murder, the Governor of Oregon blamed victim Aaron Danielson and, in substance, plaintiff Gibson, announcing in a press release "The right-wing group Patriot Prayer and self-proclaimed militia members drove into downtown Portland last night, armed and looking for a fight."

161.    She also stated in the press release "Every Oregonian has the right to freely express their views without fear of deadly violence. I will not allow Patriot Prayer and armed white supremacists to bring more bloodshed to our streets."

162.     Allowing Defendants, to continue the bad faith prosecution of Plaintiffs in *State v. Gibson* (19CR53042) and *State v. Schultz* (19CR53035) will irreparably harm Plaintiffs, and their rights to be free from bad faith prosecutions in retaliation for political speech.

163.     The above referenced injury to Plaintiffs' rights under the First, Fifth, and Fourteenth Amendment is both ongoing and irreparable.

164.     Defendants will continue the bad faith prosecution of Plaintiffs if a court order enjoining Defendants, is not entered immediately.

165.     There is no adequate remedy at law to address the above referenced activity sought to be barred.

166.     There is a substantial likelihood that Mr. Gibson and Mr. Schultz will prevail on the merits of this matter.

167.     The injury faced by Mr. Gibson and Mr. Schultz is far greater than any possible injury that would be or could be sustained by Defendants by the requested injunctive relief.

168.     The requested injunctive relief would not adversely affect public policy or public interest.

169.     In fact, it is the formal and written policy of the MCDA that the Defendants have selectively chosen not to apply to Plaintiffs because Defendants do not approve of Plaintiffs' political speech, view, and activity.

## CAUSE OF ACTION FOR RELIEF

170.     Plaintiffs hereby restate and incorporates by reference paragraphs 1 through 169 of this Complaint as if fully set forth herein.

171.    Plaintiffs have a clear legal and equitable right under Fed. R. Civ. P. 65, the First, Fifth, and Fourteenth Amendments to the Constitution of the United States, 42 U.S.C. and §§ 1983, and 1985, in prohibiting MCDA from continuing the bad faith prosecution of Plaintiffs in *State v. Gibson* (19CR53042) and *State v. Schultz* (19CR53035).

172.    Unless Defendants are first temporarily and then permanently enjoined from prosecution of Plaintiffs, Plaintiffs will be irreparably harmed because Defendants will continue to engage in bad faith, selective, and retaliatory prosecuting of Plaintiffs.

173.    Further, there is no public interest in allowing bad faith, selective, and retaliatory prosecuting of Plaintiffs by Defendants in violation of Defendants' own written policy.

174.    In fact, the bad faith prosecution of Plaintiffs is a violation of the First, Fifth, Eighth, and Fourteenth Amendments to the Constitution of the United States, 42 U.S.C. §§ 1983, and 1985.

175.    Thus, under Fed. R. Civ. P. 65, Plaintiffs are entitled to enjoin all Defendants from the prosecution of Plaintiffs in *State v. Gibson* (19CR53042) and *State v. Schultz* (19CR53035).

176.    Plaintiffs have a well-grounded fear that MCDA will continue the bad faith prosecution of Plaintiffs should Defendants not be enjoined from further prosecution of Plaintiffs in *State v. Gibson* (19CR53042) and *State v. Schultz* (19CR53035).

177.    The injury to Plaintiffs is irreparable if Defendants are not restrained from prosecution of Plaintiffs in *State v. Gibson* (19CR53042) and *State v. Schultz* (19CR53035).

178.    Plaintiffs have no adequate remedy at law to prevent the harm that will

befall Plaintiffs should Defendants continue prosecution of Plaintiffs in *State v. Gibson*

(19CR53042) and *State v. Schultz* (19CR53035).

179.    Plaintiffs are entitled to a temporary restraining order immediately

preventing Defendants from continued prosecution of Plaintiffs in *State v. Gibson*

(19CR53042) and *State v. Schultz* (19CR53035), and thereafter a temporary and

permanent injunction preventing Defendants from prosecution of Plaintiffs in *State v.*

*Gibson* (19CR53042) and *State v. Schultz* (19CR53035).

### PRAYER FOR RELIEF

180.    WHEREFORE, Plaintiffs pray for the following relief as provided by law:

(a.)    A Temporary Restraining Order immediately preventing

Defendants from prosecution of Plaintiffs in *State v. Gibson* (19CR53042) and *State v.*

*Schultz* (19CR53035);

(b.)    Thereafter, an order temporarily and then permanently enjoining

Defendants from prosecution of Plaintiffs in *State v. Gibson* (19CR53042) and *State v.*

*Schultz* (19CR53035);

(c.)    An award of attorneys' fees and costs incurred in this action

pursuant to 42 U.S.C. § 1988 or as otherwise authorized by law; and

(d.)    For such other legal and equitable relief as the United State District

Court of Oregon at Portland deems appropriate.

DATED:  September 11, 2020.

/s/  James L. Buchal
James L. Buchal, OSB No. 921618
MURPHY & BUCHAL LLP
3425 SE Yamhill Street, Suite 100
Portland, OR  97214
Tel:  503-227-1011
Fax:  503-573-1939
E-mail:  jbuchal@mbllp.com
*Attorneys for Joseph Gibson and Russell
Schultz*

/s/ D. Angus Lee
D. Angus Lee, WSB No. 36473
(*Pending Admission Pro Hac Vice*)
Angus Lee Law Firm, PLLC
9105A NE HWY 99 Suite 200
Vancouver, WA 98665
Tel: 360.635.6464 Fax: 888.509.8268
E-mail: Angus@AngusLeeLaw.com
*Attorney for Joseph Gibson and Russell
Schultz*