IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | |
|---|---|
| **JOSEPH GIBSON** and **RUSSELL SCHULTZ**, | Case No. 3:20-cv-01580-IM |
| Plaintiffs, | **OPINION AND ORDER** |
| v. | |
| **MIKE SCHMIDT**, in his official capacity as District Attorney of Multnomah County, Oregon, **MULTNOMAH COUNTY DISTRICT ATTORNEY'S OFFICE,** and **BRAD KALBAUGH**, in his official capacity as a Multnomah County Deputy District Attorney, | |
| Defendants. | |

Derek Angus Lee, Angus Lee Law Firm, PLLC, 9105a NE Hwy 99, Suite 200, Vancouver, WA 98665, and James L. Buchal, Murphy & Buchal, LLP, 3425 SE Yamhill Street, Suite 100, Portland, OR 97214. Attorneys for Plaintiffs.

Jill Schneider and David Berryman, Oregon Department of Justice, 100 SW Market Street, Portland, OR 97201. Attorneys for Defendants.

**IMMERGUT, District Judge.**

Before this Court is Plaintiffs' Motion for Temporary Restraining Order and Preliminary

Injunction, ECF 5, pursuant to Rule 65 of the Federal Rules of Civil Procedure. Plaintiffs are two

individuals each charged in state court with a single count of riot under O.R.S. 166.015. ECF 35 at ¶¶ 2–3. Plaintiffs claim that District Attorney Mike Schmidt, Deputy District Attorney Brad Kalbaugh, and the Multnomah County District Attorney's Office ("Defendants") are selectively prosecuting the riot charges in bad faith for the purpose of retaliating against Plaintiffs for their political beliefs and expression in violation of the First, Fifth, and Fourteenth Amendments. *Id.* at ¶¶ 2, 5. They seek an order from this Court enjoining Defendants from continuing to pursue the state court criminal charges. ECF 5 at 7.

Plaintiffs initially filed the instant motion and an Emergency Motion for Expedited Discovery on September 16, 2020. ECF 5; ECF 10. The following day, Plaintiffs filed an Amended Motion for Expedited Discovery and this Court set a briefing schedule on the motions. ECF 12; ECF 16. On September 30, 2020, this Court granted the Amended Motion for Expedited Discovery in part, ECF 12, for the limited purpose of determining whether this Court must abstain from interfering with the state criminal prosecution pursuant to the abstention doctrine established in *Younger v. Harris*, 401 U.S. 37 (1971). This Court ordered supplemental briefing on the abstention issue. ECF 32; ECF 33. On February 19, 2021, following the completion of the limited discovery and supplemental briefing, this Court held a hearing to determine the threshold question of whether *Younger* abstention applies to this case. After considering the pleadings, briefings, declarations, exhibits, and arguments of counsel, this Court finds that *Younger* abstention applies to this case and therefore this Court cannot exercise jurisdiction over this matter. For the reasons that follow, this case is DISMISSED without prejudice and Plaintiffs' Motion for Temporary Restraining Order and Preliminary Injunction, ECF 5, is DENIED as moot.

# BACKGROUND

**Plaintiffs' Political Activity**

Plaintiffs are Joseph Gibson and Russell Schultz. ECF 35 at ¶¶ 10–11. Under the name

"Patriot Prayer," Gibson often uses social media to organize public events "promot[ing]

patriotism, prayer, and living a God-fearing lifestyle." Gibson Decl., ECF 8 at ¶ 1. Gibson

"view[s] Antifa as an anti-American terror group" and has publicly condemned what he sees as

"the local government's indulgence and support of Antifa." *Id*. at ¶¶ 8–9. Schultz is a supporter

of Gibson and often attends public demonstrations with him. *Id*. at ¶ 10.

**The Events at Cider Riot**

On May 1, 2019, the events giving rise to Plaintiffs' criminal charges took place outside

Cider Riot, a Portland cider bar. Buchal Decl., ECF 6 at ¶ 29. Plaintiffs went to Cider Riot with a

group of Patriot Prayer supporters to participate in "a demonstration intended to call attention to

[Cider Riot's] status as a well-known hangout for Antifa members in Portland." *Id*.

Plaintiffs provided the Court with video recordings which document Gibson's activity at

Cider Riot on May 1, 2019. Buchal Decl., ECF 6 at Exs. 2–3, 9–11. The videos show that as

soon as Gibson and his supporters arrive, a hostile confrontation immediately begins between

Gibson's group and members of Antifa. *Id*. at Ex. 10 (DX10) at 00:00–01:00. Gibson films

members of Antifa while narrating commentary that Cider Riot is an "Antifa Bar," and the

masked people in the bar's patio are Antifa members. *Id*. at 01:13–01:40. Several masked Antifa

members respond by yelling at Gibson's group as well as throwing projectiles and spraying

pepper spray at Gibson and his group. *Id*. at 01:30–04:00. One Antifa member spits on Gibson.

Lee Decl., ECF 7 at ¶ 19. While the videos show Gibson discouraging the use of weapons at

various points and generally avoiding physical altercations, it also shows him appearing to

encourage one-on-one fist fights between members of Patriot Prayer and Antifa. Buchal Decl., ECF 6 at Ex. 10 (DX10) at 17:17–25:17.

When Gibson notices a fist fight breaking out between two men, he immediately runs over and instructs the crowd to put weapons away and "let them fight" because it is "mutual combat." *Id*. at 17:17–34. When someone near Gibson tells him that "mutual combat" is not legal he responds, "[o]h, you're for the law? . . . .I'm talking about morals . . . .No one jump in, no one jump in . . . . Let the men handle it." *Id*. at 17:42–18:32. Gibson helps form a circle around the fight as he continues to narrate it, saying repeatedly, "[t]his is the way it's supposed to be, two men fighting." *Id*. at 19:20–32. When one of the men appears to step back from the fight, Gibson shouts at him, "[o]h, he's out. He's out. You out? You quitting or are you in? Let's go. It's you two, let's go." *Id*. at 19:32–43.

The man returns to the fight and Gibson continues to narrate, instructing members of the crowd to put away weapons and not intervene. *Id*. at 19:43–20:02. When one man falls and the fight appears to end, Gibson approaches the man still standing and says, "[g]ood job. I like that." *Id*. at 20:02–46. He then turns the camera on himself and says, "[y]es, that's how you do it. See, two men . . . fighting like men instead of . . . running around punching people behind their back. He fought like a man. Now we're going to leave like real men." *Id*. at 21:20–23. Gibson appears to begin to leave the area with the man who fell at the end of the fight. *Id*. at 21:45–53.

Gibson then abruptly changes course and walks back toward Cider Riot after discovering that another Patriot Prayer member wants to engage in a fight. *Id*. at 21:52–22:00. When Gibson gets back to the crowd, he says, "[w]ait, someone else wants to fight? . . . Another one? We got one more?" *Id*. at 22:00–15. He asks members of the Antifa side of the crowd if they want to fight with the member of Patriot Prayer, saying "[h]e wants to fight, you don't want to fight him?

You don't want to fight? Hey, do you want to fight?" *Id*. at 22:17–23:44. Gibson then points to one member of the crowd and says, "I know you want to." *Id*.

When it appears that no one wants to engage in the fight, Gibson encourages members of the Patriot Prayer group to leave. *Id*. at 23:44–24:46. But before Gibson's group leaves, a female member of the Antifa group appears to approach someone in Gibson's group and is knocked to the ground, apparently unconscious. *Id*. at 24:46–25:20; Kalbaugh Decl., ECF 54 at Ex. C.

Unlike Gibson, Schultz's actions at Cider Riot are not fully documented on video submitted to this Court. However, an affidavit submitted in support of Schultz's arrest claims detectives observed video of Schultz "taunting and physically threatening members of the Antifa group in an effort clearly designed to provoke a physical altercation," and helping to form a circle around the men engaged in a fist fight. Kalbaugh Decl., ECF 54 at Ex. C.

Several police reports have also been made part of the record which provide a broader perspective of what various witnesses told the police and what police personally observed about the events on that day. Buchal Decl., ECF 52 at 151–178. Based on those reports, some members of Gibson's group acted aggressively toward the Antifa members by throwing projectiles and spraying pepper spray at Antifa members, and wielding batons. *Id*.; Kalbaugh Decl., ECF 54 at Ex. C.

**State Court Prosecution**

After reviewing police reports, viewing video evidence, and speaking with law enforcement, Defendant Deputy District Attorney Kalbaugh decided to issue criminal charges against Plaintiffs and four of their associates stemming from their conduct at Cider Riot on May 1, 2019. Kalbaugh Decl., ECF 54 at ¶ 4. To commence prosecution, Kalbaugh presented an affidavit of probable cause, an arrest warrant, a charging instrument, and a motion to seal to a

judge pursuant to O.R.S. 133.110. *Id*. at ¶ 6. After reviewing the documents, the judge signed the arrest warrant and granted the government's motion to seal the affidavit and accompanying charging document. *Id*. at ¶ 7. Next, Kalbaugh presented evidence to a grand jury, which endorsed the indictments as true bills in accordance with O.R.S. 132.400. *Id*. at ¶¶ 8–9. Plaintiffs were subsequently arraigned on the indictments in accordance with O.R.S. 135.010. *Id*. at ¶ 11. After arraignment, Gibson filed a demurrer arguing that the facts set forth in his indictment were insufficient to sustain the charge against him. Buchal Decl., ECF 28 at Ex. 9. The argument was fully briefed and ultimately rejected by the state court. *Id*. at Ex. 43. Trial in the state court prosecution is currently scheduled for March 8, 2021. None of the Antifa members at Cider Riot on May 1, 2019 were charged with crimes. Lee Decl., ECF 7 at ¶ 23.

During an October 23, 2020 hearing on Plaintiff Gibson's motion to compel discovery in his state court criminal case, Plaintiffs' counsel informed the presiding judge that he believed the conduct underlying Gibson's criminal charges was protected speech, and that the district attorney's office initiated the criminal charge "for the purpose of shutting [Gibson] up." Buchal Decl., ECF 52 at Ex. 2, p. 23. Plaintiffs' counsel further argued that the Constitution required that Gibson be afforded an opportunity to present this argument before having to stand trial on the charge he faced. *Id*. at Ex. 2, p. 29–30. Plaintiffs' counsel informed the judge that "the next motion that you will see from us will say in substance . . . [that] the Constitution requires that we engage in this exercise before putting [Gibson] to the [jury]." *Id*. at Ex. 2, p. 54. In response, the judge said, "I will certainly hear that. I will hear whatever motion you wish . . . ." *Id*. The hearing concluded with Plaintiffs' counsel telling the judge that they would get this argument "teed up in front of your Honor," to which the judge responded, "[o]kay." *Id*. at Ex. 2, p. 58. At

the hearing before this Court, Plaintiffs' counsel conceded that they have not yet pursued such a motion in state court.

**The Non-Prosecution Policy**

On August 11, 2020, newly elected District Attorney Mike Schmidt announced a new policy which expressly applied to criminal cases arising from ongoing nightly protests in response to the murder of George Floyd on May 25, 2020. Lee Decl., ECF 7 at Ex. F. The policy stated that all cases "arising from the current protests in our community" would be presumptively dismissed where a defendant was charged with only a single count of riot and their conduct did not involve "property damage, theft, or the use or threat of force against another person." *Id*.

In announcing the policy, District Attorney Schmidt released the following statement explaining its rationale:

> Members of our community have taken to the streets every night since the murder of George Floyd to express their collective grief, anger, and frustration over not just that senseless act of violence, but the countless other abuses People of Color have endured in our country throughout history. The demands for change go beyond calling for an end to police violence and encompass the need for all of us to acknowledge and address centuries of racism and oppression that are manifested in mass incarceration, economic inequality, educational disadvantages, and disparities in health care that have allowed COVID-19 to ravage our communities of color.
>
> As prosecutors, we acknowledge the depth of emotion that motivates these demonstrations and support those who are civically engaged through peaceful protesting. We recognize that we will undermine public safety, not promote it, if we leverage the force of our criminal justice system against peaceful protestors who are demanding to be heard.
>
> The Multnomah County District Attorney's Office will always strive to advance the safety of our community and its members. We recognize the need to broaden our vision of what a safe community means and our role in promoting that vision. To advance public safety we must not only prevent crime, but must also promote economic and housing stability, educational opportunities, strong family and community relationships, and the mental and physical health of all those who live in our county.
>
> Seen through that lens, the prosecution of cases relating solely to protest activities, most

of which have a weak nexus to further criminality and which are unlikely to be deterred by prosecution, draws away from crucially needed resources. As stewards of public resources, we must devote our efforts to prosecuting crimes that allow us to protect our most vulnerable victims to have the greatest impact on promoting a safer community for everyone in Multnomah County.

Lee Decl., ECF 7 at Ex. F.

Believing that Gibson's charge warranted presumptive dismissal under the new policy, Plaintiffs' counsel sent Deputy District Attorney Kalbaugh a letter on August 11, 2020, asking that Gibson's charges be dropped. *Id*. at Ex. G. After conferring with District Attorney Schmidt, Kalbaugh informed Plaintiffs' counsel that because the "new policy pertaining to riot trials is not retroactive," the charges against Plaintiffs would not be dropped. *Id*. at Ex. I.

In an email sent on August 14, 2020, Plaintiffs' counsel wrote to Kalbaugh to ask why the policy would not be applied retroactively to Plaintiffs. *Id*. at Ex. J. Counsel wrote, "I don't see anything in the policy regarding retroactivity . . . However, it does say that the policy will apply to 'all referred cases arising from the current protests.' So, just so I understand, it does apply to cases from the protests that began around the end of May of 2020 through current, but does not apply back further to Mr. Gibson's case?" *Id*. Kalbaugh responded "[t]hat's my understanding." *Id*. Plaintiffs have not presented any evidence that the District Attorney's Office has applied the non-prosecution policy to any protesters charged with riot outside of the George Floyd protests.

**Plaintiffs' Federal Court Claim**

Plaintiffs initiated this federal court action on September 11, 2020. ECF 1. They claim "Defendants are engaged in a bad faith, selective, and retaliatory prosecut[ion] of Plaintiffs" in response to Plaintiffs' "publicly expressed opinions with which Defendants disagree." ECF 35 at

¶ 2. Plaintiffs assert that Defendants' bad faith motives are evidenced by the political environment in Portland and the circumstances surrounding their arrests and prosecutions.

With respect to the political environment, Plaintiffs allege that political leaders in Portland, joined by the local media, have engaged in a longstanding, "continuous attack upon Mr. Gibson for his political views" while displaying "an extraordinary failure to provide equal protection of the laws where Antifa members were concerned." *Id.* at ¶ 25; *see also* Buchal Decl., ECF 6 at ¶ 3. Plaintiffs focus specifically on newly elected District Attorney Mike Schmidt and Mayor Ted Wheeler as biased in favor of Antifa members and against Gibson. ECF 35 at ¶¶ 40, 47, 82–87, 140–46, 157–59; ECF 50 at 6. Plaintiffs allege a "political alliance between defendants and the Antifa/BLM movement," based on, among other things, the District Attorney's Office's failure to prosecute riot charges against individuals involved in unlawful conduct during the George Floyd protests and the fact that 43 prosecutors from the District Attorney's Office formally requested that the office issue "a public and unequivocal statement in support of Black Lives Matter." ECF 50 at 6; Buchal Decl., ECF 52 at ¶ 9. As further evidence of political bias against Plaintiffs, Plaintiff Schultz claims he was told by a law enforcement officer during his arrest that Mayor Wheeler had "pressured" the District Attorney to charge Plaintiffs. Schultz Decl., ECF 9 at ¶ 9.

With regard to the circumstances surrounding their prosecutions, Plaintiffs claim Defendants' bad faith is shown by Defendants excluding Plaintiffs from participating in the grand jury process, the timing of Plaintiffs' arrests, a lack of evidence supporting their riot charges, and Defendants' refusal to apply the new non-prosecution policy to dismiss their cases. Buchal Decl., ECF 6 at ¶ 79. Plaintiffs also challenge the veracity of the affidavits used to support their indictments. *Id.* at ¶¶ 86–87.

Defendants counter that the charges brought against Plaintiffs were supported by probable cause and were based on information gathered by the police after reviewing videos and interviewing witnesses. ECF 53 at 4–5. Defendants characterize Plaintiffs' conduct on May 1, 2019 as "taunting and physically threatening members of the Antifa group in an effort clearly designed to provoke a physical altercation," and note that the "videos show Plaintiffs in a circle surrounding two people engaged in a fist fight, Plaintiff Gibson physically push a woman, and the Plaintiffs' group throwing projectiles, including a rock." *Id.* at 4. Defendants further argue that the pending state prosecutions were presented to a grand jury and a judge and were determined to be supported by probable cause. *Id*. at 3. They also assert that Plaintiffs have no "standing" to challenge the non-prosecution policy because "it does not apply to them." *Id*. at 8. At the hearing before this Court on February 19, 2021, Defendants' counsel argued for the very first time in this litigation that the purpose of District Attorney Schmidt's non-prosecution policy was to effectively manage resources in the wake of hundreds of arrests that occurred during the George Floyd protests. Defendants do not address why no Antifa members were charged in the May 1, 2019 Cider Riot incident.

## STANDARDS

### A. *Younger* Abstention

*Younger* abstention is a "circumscribed exception to mandatory federal jurisdiction," which provides that federal courts sitting in equity cannot, absent exceptional circumstances, enjoin pending state criminal proceedings. *Baffert v. Cal. Horse Racing Bd.*, 332 F.3d 613, 617 (9th Cir. 2003) (internal quotation marks omitted); *Younger*, 401 U.S. at 42–54. "[R]ooted in overlapping principles of equity, comity, and federalism," *San Jose Silicon Valley Chamber of Com. Pol. Action Comm. v. City of San Jose*, 546 F.3d 1087, 1091 (9th Cir. 2008), *Younger* abstention is a jurisprudential doctrine centrally concerned with the "threat to our federal system

posed by displacement of state courts by those of the National Government," *Moore v. Sims*, 442 U.S. 415, 423 (1979). In light of these considerations, a federal court must determine whether *Younger* abstention applies and requires dismissal before it can consider the merits of a claim challenging ongoing state court proceedings. *Washington v. L.A. Cty. Sheriff's Dep't*, 833 F.3d 1048, 1058 (9th Cir. 2016).

*Younger* abstention applies where, "(1) a state-initiated proceeding is ongoing; (2) the proceeding implicates important state interests; (3) the federal plaintiff is not barred from litigating federal constitutional issues in the state proceeding; and (4) the federal court action would enjoin the proceeding or have the practical effect of doing so, i.e., would interfere with the state proceeding in a way that *Younger* disapproves." *San Jose*, 546 F.3d at 1092. Where all four elements are met, the district court is required to dismiss the action. *Canatella v. California*, 404 F.3d 1106, 1113 (9th Cir. 2005) ("*Younger* abstention imposes mandatory limits on the federal courts' ability to exercise jurisdiction.").

The Supreme Court has recognized limited exceptions to mandatory abstention under *Younger* where there is a "showing of bad faith, harassment, or some other extraordinary circumstance that would make abstention inappropriate." *Middlesex Cty. Ethics Comm. v. Garden State Bar Ass'n*, 457 U.S. 423, 435 (1982). Such exceptions are "narrow." *Huffman v. Pursue, Ltd.*, 420 U.S. 592, 602 (1975). They apply "[o]nly in cases of proven harassment or prosecutions undertaken by state officials in bad faith without hope of obtaining a valid conviction and perhaps in other extraordinary circumstances where irreparable injury can be shown." *Perez v. Ledesma*, 401 U.S. 82, 85 (1971); *see also Juidice v. Vail*, 430 U.S. 327, 338 (*Younger* exceptions "may not be utilized unless" a plaintiff can "allege[] and prove[]" bad faith or harassment.).

**DISCUSSION**

**B.  *Younger* Abstention**

  **1.  State-initiated proceedings are ongoing**

First, the Court must determine whether there are ongoing state judicial proceedings. *San Jose*, 546 F.3d at 1092. As noted in the amended complaint, Plaintiffs seek an injunction barring the "continued prosecution of Plaintiffs in *State v. Gibson* (19CR53042) and *State v. Schultz* (19CR53035)." ECF 35 at ¶ 1. At the hearing before this Court on February 19, 2021, the parties confirmed that the state criminal proceedings are ongoing and trial is set for March 8, 2021.

Accordingly, this element is satisfied.

  **2.  The state proceedings implicate important state interests**

Second, in order for *Younger* to apply, the state proceeding must implicate important state interests. *San Jose*, 546 F.3d 1092. Whether a proceeding implicates important state interests "is measured by considering its significance broadly, rather than by focusing on the state's interest in the resolution of an individual case." *Baffert*, 332 F.3d at 618.

The state court proceedings here clearly implicate important state interests. Plaintiffs are charged in Oregon state courts with violating an Oregon criminal statute. *See Gilbertson v. Albright*, 381 F.3d 965, 977 (9th Cir. 2004) (en banc) ("[J]udicial proceedings or disciplinary proceedings which are judicial in nature are the type of proceeding that does implicate an important state interest.").

Plaintiffs argue that Defendants' adoption of the Policy shows that "the state has no interest in prosecuting riot relating to protest activity." ECF 55 at 5. This argument misunderstands the relevant inquiry. *Younger* abstention is concerned with "federal *court* interference with state *court* proceedings." *Younger*, 401 U.S. at 43 (emphasis added). The important state interest here is the state's interest in adjudicating state criminal cases within its

own judicial system, not the district attorney's office's interest in pursuing the specific charges in this case. Thus, this element is also satisfied.

### 3. Plaintiffs are not barred from litigating federal constitutional issues in the state proceedings

Next, this Court must determine whether Plaintiffs have "an adequate opportunity in the state proceedings to raise constitutional challenges." *Middlesex Cty.*, 457 U.S. at 432. "The 'adequate opportunity' prong of *Younger* . . . requires only the absence of 'procedural bars' to raising a federal claim in the state proceedings." *Commc'ns Telesys. Int'l v. Cal. Pub. Util. Comm'n*, 196 F.3d 1011, 1020 (9th Cir. 1999) (citing *Middlesex Cty.*, 457 U.S. at 432). "[A] federal court should assume that state procedures will afford an adequate remedy, in the absence of unambiguous authority to the contrary." *Pennzoil Co. v. Texaco, Inc.*, 481 U.S. 1, 15 (1987). "[T]he burden on this point rests on the federal plaintiff[s] to show that 'state procedural law barred presentation of [their] claims.'" *Id.* at 14 (quoting *Moore*, 442 U.S. at 432).

Plaintiffs have not met their burden. They argue that they do not have an adequate opportunity to raise their constitutional challenges in state court because they are "limited to [seeking] post-conviction relief." ECF 55 at 5 (internal quotation marks omitted). Plaintiffs further suggest that they cannot get fair and balanced consideration of their selective prosecution and viewpoint discrimination claims in state court. ECF 50 at 3 n.1. However, these arguments are not supported by the facts of this case or the law.

First, Plaintiffs' opportunity to raise their constitutional claims in state court is not limited to post-conviction proceedings. Indeed, Plaintiffs' counsel informed the state court during an October 23, 2020 hearing that he intended to file a motion arguing that Gibson's prosecution was being pursued in bad faith for the purpose of chilling protected speech, and that the Constitution required that the state court address this argument before Gibson stood trial on his riot charge.

ECF 52 at Ex. 2, p. 23, 29–30, 57–58. In response, the state court judge said "I will certainly hear that. I will hear whatever motion you wish . . . ." *Id.* at Ex. 2, p. 54. Further, there is no evidence in the record that any judge exhibited bias against Plaintiffs.

Criminal defendants in Oregon state court can and do raise federal constitutional challenges based on claims of vindictive and selective prosecution at the trial court level, which may then be reviewed by the Oregon Court of Appeals and the Oregon Supreme Court. *See e.g.*, *State v. Farrar*, 309 Or. 132, 134–142 (1990) (reviewing state trial court's denial of selective prosecution claim which defendant was afforded the opportunity to develop at a pretrial hearing); *State v. Kadderly*, 176 Or. App. 396 (2001) (reviewing state trial court's denial of a motion to dismiss a criminal indictment for selective and vindictive prosecution).

Second, even if Plaintiffs were unable to raise their claims until post-conviction proceedings, the opportunity to raise federal constitutional challenges on judicial review satisfies the third requirement of *Younger*. *See Hirsh v. Justs. of Sup. Ct. of Cal.*, 67 F.3d 708, 713 (9th Cir. 1995) (citing *Ohio Civil Rights Comm'n v. Dayton Christian Schools, Inc.*, 477 U.S. 619, 629 (1986); *Kenneally v. Lungren*, 967 F.2d 329, 332 (9th Cir.1992)).

Therefore, Plaintiffs are not barred from litigating federal constitutional issues in their state court proceedings and this requirement is met.

### 4. The instant federal action would enjoin the state court proceedings or have the practical effect of doing so

Finally, the Court must determine whether the requested relief in the instant action would "enjoin—or have the practical effect of enjoining—ongoing state proceedings." *ReadyLink Healthcare, Inc. v. State Comp. Ins. Fund*, 754 F.3d 754, 758 (9th Cir. 2014). Here, Plaintiffs seek "an order temporarily and then permanently enjoining Defendants from prosecution of Plaintiffs in *State v. Gibson* (19CR53042) and *State v. Schultz* (19CR53035)." ECF 35 at ¶ 183.

Accordingly, the fourth requirement is met, and the Court must dismiss this case pursuant to the *Younger* abstention doctrine unless an exception applies. *See, e.g.*, *Herrera v. City of Palmdale* 918 F.3d 1037, 1042 (9th Cir. 2019) ("when a court abstains under *Younger*, claims for injunctive and declaratory relief are typically dismissed").

### 5.  No exception to *Younger* abstention applies

#### a.  Bad Faith

As noted above, the bad faith and harassment exceptions to *Younger* abstention are "narrow." *Huffman*, 420 U.S. at 602. These exceptions "may not be utilized unless" a plaintiff can "allege[] and prove[]" bad faith or harassment. *Juidice*, 430 U.S. at 338; *see also DeMartino v. N.Y. State Dep't of Labor*, 167 F. Supp. 3d 342, 354 (E.D.N.Y 2016) ("A party seeking to circumvent *Younger* abstention bears the burden of establishing the applicability of one of the[] exceptions"). For *Younger* abstention purposes, bad faith "generally means that a prosecution has been brought without a reasonable expectation of obtaining a valid conviction." *Kugler v. Helfant*, 421 U.S. 117, 126 n.6 (1975). The bad faith exception does not come into play simply because the state might have brought a weak case against a defendant. *Kihagi v. Francisco*, No. 15-cv-01168-KAW, 2016 WL 5682575, at *4 (N.D. Cal. Oct. 3, 2016) ("Evidence of bad-faith harassment . . . must be more than the prosecution of close cases.").

Plaintiffs argue that the bad faith exception applies because (1) the state has no reasonable expectation of obtaining valid convictions and (2) the prosecutions were undertaken and continue for the purpose of retaliating against and deterring Plaintiffs' political activity. ECF 50 at 22–32. The Court considers each argument in turn.

##### i.  *Reasonable expectation of obtaining a valid conviction*

Plaintiffs are each charged with one count of riot pursuant to O.R.S. 166.015. ECF 35 at ¶ 3. The statute explains that "[a] person commits the crime of riot if while participating with

five or more other persons the person engages in tumultuous and violent conduct and thereby

intentionally or recklessly creates a grave risk of causing public alarm." O.R.S. 166.015. Under

O.R.S. 166.015, "tumultuous and violent conduct" includes "interference with a victim's escape

or obstruction of persons who might assist the victim." *State ex rel. Juvenile Dep't of

Washington Cty. v. Saecho*, 167 Or. App. 227, 236 (2000). In *Saecho*, the Oregon Court of

Appeals found that a youth engaged in "tumultuous" behavior under O.R.S. 166.015 by joining a

group of boys to threaten and surround a victim, preventing his escape while another boy

attacked him. *Id*. at 229–30, 236. The court noted that "[t]here is certainly nothing within the

meaning of [O.R.S. 166.015] that requires that a participant have physical contact with any other

person." *Id*. at 236.

As noted above, video recordings from that day show Gibson encouraging one-on-one

fist fights between members of Patriot Prayer and Antifa. Buchal Decl., ECF 6, Ex. 10 (DX10),

at 17:17–25:17. Gibson is shown helping to form a circle around a fight, encouraging the

participants to continue fighting when they take a break, and instructing members of the crowd

not to intervene. *Id*. at 19:20–20:02.

At one point, Gibson begins soliciting members of the crowd to fight a member of Patriot

Prayer, saying "[h]e wants to fight, you don't want to fight him? You don't want to fight? Hey,

do you want to fight?" and pointing to one member of the Antifa crowd and saying, "I know you

want to." *Id*. at 22:17–23:44.

While Schultz's actions at Cider Riot are not fully documented on video submitted to this

Court, an affidavit submitted in support of his arrest claims detectives observed video of Schultz

"taunting and physically threatening members of the Antifa group in an effort clearly designed to

provoke a physical altercation," and helping to form a circle around the men engaged in a fist

fight. Kalbaugh Decl., ECF 54 at Ex. C. The physical altercations between Plaintiffs' group and Antifa continued to escalate until one of Plaintiffs' associates allegedly knocked a woman unconscious. *Id*.[1]

Based on this Court's review of the videos presented by Plaintiffs and the police reports documenting police observations and witness statements, once Gibson and his group appeared at Cider Riot on May 1, 2019, the scene degenerated into a chaotic melee of angry people both from Antifa and from Gibson's group throwing insults and projectiles at one another, as well as pepper spraying each other, and then fighting each other. Buchal Decl., ECF 52 at 151–178; Buchal Decl., ECF 6 at Ex. 10 (DX10). It is not appropriate for this Court to determine the accuracy of all the statements and reports as long as the record shows that the prosecution brought the charges with a reasonable expectation of conviction.

Plaintiffs' charges have survived scrutiny under the state court system's procedural safeguards. Deputy District Attorney Kalbaugh presented an affidavit of probable cause, an arrest warrant, a charging instrument, and a motion to seal to a judge who signed the arrest warrant and granted the government's motion to seal the affidavit and accompanying charging document. Kalbaugh Decl., ECF 54 at ¶¶ 6–7. The facts in Deputy District Attorney Kalbaugh's affidavit were derived from police reports, video evidence, and conversations with law enforcement investigators. *Id*. at Ex. C. A grand jury then endorsed the indictments as true bills and Plaintiffs were arraigned. *Id*. at ¶¶ 8–9, 11. After arraignment, Plaintiff Gibson filed a demurrer arguing that the facts set forth in his indictment were insufficient to sustain the charge

---

[1] Although this Court had the opportunity to review video provided by Plaintiffs' counsel, which showed a limited view of the events, police officers apparently had access to additional video recordings which were provided to the District Attorney's Office. Kalbaugh Decl., ECF 54 at Ex. C; Buchal Decl., ECF 52 at 151–178.

against him. Buchal Decl., ECF 28 at Ex. 9. The argument was fully briefed and ultimately rejected by the state court. *Id*. at Ex. 43. This Court finds no evidence in the record suggesting the presence of any procedural deficiencies in Plaintiffs' state court proceedings. While evidence that Plaintiffs' charges have gone through the traditional state criminal process is not dispositive on the issue of bad faith, it is powerful evidence tending to rebut the assertion that the charges are a complete "sham," as argued by Plaintiffs.

Based on this record, this Court finds that Plaintiffs have not proven that Defendants filed the charges against them without a reasonable expectation of obtaining a valid conviction. Although Plaintiffs make compelling arguments that their conduct does not rise to the level of "tumultuous and violent" conduct under O.R.S. 166.015, they have not met their burden of showing that the charges against them are facially meritless such that this Court should invoke the narrow bad faith exception to *Younger* abstention. In so finding, this Court is not making any determination about the strength of the prosecution's case and whether ultimately the prosecution can prove the charges against the Plaintiffs beyond a reasonable doubt. It is inappropriate for this Court to weigh in on the strength of the evidence and Plaintiffs will have the opportunity to litigate whether the evidence is sufficient to support the charge of riot in their state court proceedings.

*ii.  Selective and Retaliatory Prosecution*

Next, Plaintiffs argue that *Younger*'s bad faith exception applies here because their criminal prosecutions were undertaken for the purpose of interfering with Plaintiffs' constitutionally protected speech. ECF 50 at 24–32. Plaintiffs contend that where a prosecution is shown to be motivated by a desire to chill First Amendment expression, *Younger*'s bad faith exception applies even without proof that the state has no reasonable expectation of obtaining a valid conviction. *Id*. at 24.

PAGE 18 – OPINION AND ORDER

First, it is not clear that *Younger's* bad faith exception may be applied without a showing that the state has no reasonable expectation of obtaining a valid conviction. Some courts have held that the bad faith exception applies only where plaintiffs prove that the state has initiated the state court proceedings without any reasonable expectation of success. *See Carbone v. Zollar*, 845 F. Supp. 534, 538 (N.D. Ill. 1993); *Gwynedd Props. v. Lower Gwynedd Twp.*, Civ. A. No. 91–6567, 1991 WL 270004, at *3 (E.D. Pa. Dec. 12, 1991) (*aff'd in part, rev'd in part on other grounds*, 970 F.2d 1195 (1992)). Courts adhering to this interpretation have held that "allegations of selective prosecution are insufficient in themselves to meet the bad faith exception." *Carbone*, 845 F. Supp. at 538; *see also Miller v. Sutton*, No. 3:15-cv-1111 (MPS), 2016 WL 3976540, at *17 (D. Conn. July 21, 2016) ("It is unclear that claims of selective prosecution—even when adequately alleged—are sufficient to establish that the narrow bad faith exception to *Younger* applies.").

Second, even if this Court were to apply the broader interpretation of the bad faith exception urged by Plaintiffs, this case would still not qualify. A closer look at the cases Plaintiffs rely on to proffer this approach is illustrative. Plaintiffs cite two cases where federal courts chose to apply *Younger's* bad faith exception in the absence of proof that the challenged state court proceedings had been initiated without a reasonable expectation of success, *Fitzgerald v. Peek*, 636 F.2d 943 (5th Cir. 1981) and *Lewellen v. Raff*, 843 F.2d 1103 (8th Cir. 1988).[2] ECF

---

[2] Plaintiffs also cite *Younger*, 401 U.S. at 48, *Elrod v. Burns*, 427 U.S. 347 (1976), and *United States v. P.H.E., Inc.*, 965 F.2d 848 (10th Cir. 1992) to support their argument that under certain circumstances *Younger*'s bad faith exception can apply even without a showing that the state has no reasonable expectation of success. These cases do not support Plaintiffs' argument. The cited portion of *Younger* discusses *Dombrowski v. Pfister*, 380 U.S. 479 (1965), where a federal injunction was granted based on threats of state prosecutors to enforce criminal statutes without "any expectation of securing valid convictions." *Younger*, 401 U.S. at 48 (quoting *Dombrowski*, 380 U.S. at 482). Neither *Elrod* nor *P.H.E.* involved *Younger* abstention at all.

50 at 24. In both *Fitzgerald* and *Lewellen*, federal plaintiffs sought injunctions of state criminal prosecutions in part because of the bad faith actions of state court judges. In *Fitzgerald*, the district court found that a state court "prosecution was brought for the purposes of harassment and retaliation and would not have been brought but for the improper influence exerted on the prosecutor by certain [] judges to seek the indictments." 636 F.2d at 945. Similarly, in *Lewellen*, the judge presiding over the plaintiff's state criminal case was a named defendant in the plaintiff's federal action seeking an injunction of the state proceeding. 843 F.2d at 1108. The district court found that the state court judge had aided prosecutors in a conspiracy to criminally charge the plaintiff, who was a lawyer, "(1) because of his race; (2) because he had vigorously attempted to defend his client . . . against [a] rape charge; and (3) because they wished to thwart [plaintiff's] campaign for state office against a political ally of [the local sheriff]." *Id.* at 1110. Findings of bad faith on the part of the judges overseeing state proceedings undermine *Younger's* central rationale of comity and respect for state functions. It would be illogical for a federal court to insist that a plaintiff air a claim in state court when the state court itself is source of the injury.

This case is not like *Fitzgerald* and *Lewellen*. Nothing in the record suggests any impropriety on the part of the state court in Plaintiffs' criminal proceedings. To the contrary, the judge in Plaintiff Gibson's case explicitly indicated a willingness to hear his selective prosecution claim before trial. ECF 52 at 118. Here, where the record is devoid of any reason to mistrust the state proceedings, *Younger's* comity rationale is in full effect and the application of the bad faith exception is unwarranted. *See Hicks v. Miranda*, 422 U.S. 332, 351 (1975).

As circumstantial evidence of bad faith, Plaintiffs point to the state's refusal to extend the non-prosecution policy retroactively to Plaintiffs' cases, while incidents of allegedly more extreme conduct from the George Floyd protests went uncharged pursuant to the non-prosecution

policy. ECF 50 at 26–27, 29–31. Plaintiffs also cite to the fact that Antifa participants in the

Cider Riot conflict were not criminally charged. *Id.*. They further speculate that their charges

were filed at a time designed to deter their participation in another anti-Antifa protest and that

their charges "would not have been brought but for the improper influence on the prosecutor by

Mayor Wheeler."[3] *Id.* at 26, 28. These allegations are not based on sufficient concrete evidence

to meet the heavy burden of proving that *Younger's* bad faith exception applies. *See Joseph v.

City of San Jose*, Case No. 19-CV-01294-LHK, 2020 WL 1031899, at *16 (N.D. Cal Mar. 3,

2020) ("A plaintiff must provide something more than conclusory allegations that the state

proceeding is the product of bad faith or harassment."); *Kihagi*, 2016 WL 5682575, at *4

("Evidence of bad-faith harassment must be more than multiple prosecutions, must be more than

conclusory statements about motive, must be more than a weak claim of selective prosecution,

and must be more than the prosecution of close cases.") (internal quotation marks and citation

omitted).

In the briefing, counsel for Defendants failed to provide any justification for the non-

prosecution policy or explain why it was not evidence of Defendants' bias against Plaintiffs.

Instead, counsel mistakenly argued Plaintiffs have no "standing" to challenge the policy because

---

[3] In a declaration prepared by their counsel, Plaintiffs claim that in March 2019, "it was publicly reported that Mayor Wheeler was bringing pressure on the Multnomah County District Attorney's office to arrest right wing protesters." Buchal Decl., ECF 6 at ¶ 28 & n.25 (citing AP, *Assault arrest made after Portland mayor complains* (Mar. 13, 2019), https://www.registerguard.com/news/20190312/assault-arrest-made-after-portland-mayor-complains). However, the cited article does not support this assertion because it only reports that Mayor Wheeler publicly complained that criminal charges were not being pursued in the wake of a violent altercation between members of Patriot Prayer and Antifa. Although the article reports that a member of the right-wing Proud Boys group was arrested on assault charges a day after the Mayor's comments, there is no indication in the reporting that the Mayor called for right wing participants in the altercations to be arrested over members of Antifa. In fact, the article reports that Mayor Wheeler vowed that "anyone fighting will not go unpunished."

Plaintiffs' charges occurred outside of the policy time period. ECF 53 at 8. At the hearing, counsel for Defendants raised resource considerations for the very first time in this litigation as the purpose of the policy, without offering any evidence to support her position, other than the language of the policy itself. Inexplicably, counsel for Defendants also completely ignores Plaintiffs' argument that the fact that no Antifa members were charged in the Cider Riot incident on May 1, 2019 shows Defendants' animus toward Plaintiffs' viewpoint. Despite defense counsel's deficient arguments, this Court finds that the record does not establish that the prosecutions against Plaintiffs were brought in bad faith such that this Court should intervene in the state court prosecution. Defendant Kalbaugh's affidavit establishes that he relied on police reports recounting the events at Cider Riot, as well as interviews with law enforcement and his own review of the videos. Kalbaugh Decl., ECF 54 at ¶ 4. Based on his review, Kalbaugh determined that there was probable cause to support the riot charges against Plaintiffs. That determination was then supported by a state court judge who issued arrest warrants and by the grand jury which returned indictments based on the evidence presented. *Id*. at ¶¶ 6–9. In this Court's view, the fact that others at the scene of Cider Riot could also have been charged with criminal conduct is not sufficient to establish bad faith.

Similarly, this Court does not find that Defendants' failure to apply District Attorney Schmidt's non-prosecution policy retroactively to Plaintiffs is sufficient to support their claim of bad faith. There is no evidence that the non-prosecution policy has been applied retroactively to any cases from before the George Floyd protests, nor has any evidence been presented indicating the political ideologies of those who have benefitted from the new non-prosecution policy. To the extent that the policy was indeed an effort to address the resource constraints brought about by hundreds of arrests during the summer protests, the policy is poorly written and should have

clearly stated that. The District Attorney certainly has broad discretion to manage his resources, and to set new policies that are not to be applied retroactively. He does not have discretion to prosecute people based on viewpoints with which he does not agree. But this Court does not find on the record presented that the failure to apply the policy to Plaintiffs is sufficient to show that Plaintiffs are being prosecuted based on viewpoint.

Plaintiffs also point to the two-month delay between the May 1, 2019 altercation and Gibson's arrest, which they claim "was designed to suppress plaintiff's participation in a well-publicized future conservative event." ECF 50 at 35.  But this Court does not find that a two-month delay between the May 1, 2019 incident and Mr. Gibson's arrest was suspiciously timed based on the amount of evidence the prosecution had to examine. *See* Kalbaugh Decl., ECF 54 at ¶ 4. Furthermore, Gibson was not detained on these charges, so he was free to engage in any protests. Accordingly, there is no evidence to support the theory proffered by Plaintiffs.

Plaintiffs also assert that the prosecutor's decision not to invite Mr. Gibson to testify before the grand jury shows bad faith. This assertion is without merit. The prosecution has complete discretion to determine which witnesses to present to a grand jury and, for several reasons, it is highly unusual for a defendant to testify at that early stage in a criminal prosecution.

In finding that Plaintiffs have not shown that this case fits into the narrow bad faith exception to *Younger* abstention, this Court is not opining on the ultimate validity of their selective prosecution claim. Plaintiffs can raise the same claim in their state criminal proceedings where it can be fully and fairly litigated. *See Middlesex Cty.*, 457 U.S. at 431 ("Minimal respect for the state processes . . . precludes any presumption that the state courts will not safeguard federal constitutional rights.") (emphasis omitted).

PAGE 23 – OPINION AND ORDER

### b. Irreparable Injury

Finally, Plaintiffs argue *Younger* abstention should not apply because this case presents "extraordinary circumstances" where there is both "great and immediate" danger that Plaintiffs will suffer irreparable injury unless this Court enjoins their state proceedings." ECF 50 at 32–37 (citing *Younger*, 401 U.S. at 46). Plaintiffs claim they face danger of great and immediate irreparable injury because (1) their prosecutions were brought in bad faith, (2) their First Amendment rights have been blatantly infringed by public officials, (3) there is a reasonable possibility "that they will face prosecution again if they engage in advocacy of the same genre as that which brought on the initial prosecution," and (4) they have suffered reputational and economic injury which "far exceeds the normal costs and anxiety associated with defending against [] criminal prosecution." *Id.*

First, as explained above, Plaintiffs have not met their burden of proving that their state court prosecutions were brought in bad faith sufficient to fall within a narrow exception *Younger* abstention. Second, even assuming Plaintiffs can show that their First Amendment rights have been violated, any threat of injury would not be "great and immediate" because Plaintiffs can raise this claim in state court. Plaintiffs' third argument only presents a danger of irreparable injury if the conduct underlying their criminal charges is constitutionally protected, which has not been established.

Finally, Plaintiffs have not shown economic injury and reputational damage far exceeding the normal costs associated with defending against a single prosecution. The cost, anxiety, and inconvenience of defending against a single prosecution brought in good faith is not enough to establish the great and immediate threat of irreparable injury necessary to justify enjoining a pending state proceeding. *Younger*, 401 U.S. at 46. Plaintiffs' attempt to analogize their economic and reputational damage to *Krahm v. Graham*, 461 F.2d 703 (9th Cir. 1972),

fails. ECF 50 at 36. In *Krahm*, the Ninth Circuit found that a group of owners and clerks of newsstands and bookstores facing more than 90 pending prosecutions under a state's anti-obscenity law despite having already secured 11 acquittals in similar cases would suffer irreparable injury absent federal intervention. *Id.* at 707–08. In addition to the facially obvious difference in scale between the harm faced by Plaintiffs and the plaintiffs in *Krahm*, Plaintiff Gibson's own words betray his claim of exceptional economic and reputational harm. In a November 2019 interview, while Gibson was facing his current riot charge in addition to unrelated civil lawsuits, he said, "I haven't seen things get harder for me. I have seen more support from people seeing how serious this is . . . . I'll get like 3,000 extra subscribers the day that I get charged." ECF 53 at 7 (citing Jonathan Levinson, *Patriot Prayer, Proud Boys Continue Violence Even As Legal Consequences Mount*, Or. Pub. Broadcasting (Nov. 14, 2019), https://www.opb.org/news/article/patriot-prayer-proud-boys-political-violence-law-enforcement/).

 Thus, Plaintiffs have not shown that this case presents extraordinary circumstances where they face great and immediate danger of irreparable injury absent federal intervention.

## CONCLUSION

This Court finds that *Younger* abstention applies to this case. Accordingly, this case is DISMISSED without prejudice and Plaintiffs' Motion for Temporary Restraining Order and Preliminary Injunction, ECF 5, is DENIED as moot.


**IT IS SO ORDERED**.

DATED this 26th day of February, 2021.

/s/ Karin J. Immergut
Karin J. Immergut
United States District Judge
